1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MARIO STANFORD,

11           Petitioner,              No. CIV S-03-0534 DFL EFB P

12       vs.

13   DAVID L. RUNNELS, Warden,        FINDINGS & RECOMMENDATIONS

14           Respondent.

15   _____/

16       Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a January 2000 judgment of

18   conviction entered against him in Solano County Superior Court on charges of murder with the

19   special circumstance of rape by instrument, genital penetration with a foreign object resulting in

20   great bodily injury, and residential burglary.  Petitioner seeks relief on the grounds that:  (1) the

21   trial court erred in admitting evidence of petitioner's pretrial statements to detectives because

22   petitioner did not waive his *Miranda* rights; (2) the evidence was insufficient to prove the special

23   circumstance allegation of rape; and (3) petitioner was denied due process by the trial court's

24   failure to instruct the jury that the rape special circumstance could not be found true if the rape

25   was merely incidental to the murder.  Upon careful consideration of the record and applicable

26   law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

1

PROCEDURAL BACKGROUND

On December 22, 1997, after a two-week trial, the jury returned a verdict finding petitioner guilty of first degree murder, Cal. Penal Code § 187(a); forcible genital penetration with a foreign object, *id. at* § 289(a); and residential burglary, *id. at* § 459; and found true the special circumstance allegation of rape by instrument, *id. at* § 190.2(a)(17)(K), and a sentence enhancement based upon great bodily injury, *id. at* § 12022.7.  Clerk's Transcript on Appeal ("CT") at 486-489.

On May 14, 1998, the trial court granted petitioner's motion for a new trial based on juror misconduct.  CT at 636.  On August 30, 1999, the California Court of Appeal reversed and remanded the case for further proceedings.  *Id.* at 683-697.  The order was modified on September 22, 1999, upon the court's denial of rehearing.  *Id.* at 680.  The remittitur issued on December 16, 1999.  *Id.* at 682.

On January 19, 2000, the trial court sentenced petitioner to life without possibility of parole plus an additional eleven years (eight years for rape, Cal. Penal Code § 289(a), and three years for great bodily injury, *id. at* § 12022.7).  *Id.* at 722-727.

Petitioner filed a notice of appeal on January 28, 2000.  *Id.* at 728-29.  On October 4, 2001, the California Court of Appeal for the First District (Division Five) issued an unpublished opinion affirming the trial court's judgment in its entirety.  Exh. D to Answer (hereafter "Opinion").

Petitioner filed a petition for review on November 13, 2001, Exh. E to Answer,  which the California Supreme Court summarily denied on December 19, 2001. Exh. F to Answer.

On February 25, 2003, petitioner filed this petition for writ of habeas corpus in the U.S. District Court for the Northern District of California.  In support of the petition, petitioner attached a copy of his opening appellate brief before the California Court of Appeal (hereafter "Appellate Brief" or "App. Brf.").

////

On March 14, 2003, the petition was transferred to this court by order of the Honorable Susan Illston on the ground that both the place of petitioner's conviction (Solano County Superior Court) and the place of his incarceration (High Desert State Prison in Lassen County) lie within the venue of the U.S. District Court for the Eastern District of California. 28 U.S.C. §§ 2241(d), 1404(a).

Respondent filed an answer on July 1, 2003. On September 10, 2003, petitioner filed a "Denial and Exception to Return," which "realleges and incorporates" his writ petition, including petitioner's opening appellate brief, and which this court construes as petitioner's traverse.[1]

## FACTUAL BACKGROUND[2]

The victim, an elderly widow who lived alone, was discovered by the police after they were contacted by her neighbors who, returning home at approximately 1:00 a.m., noticed that the side gate to her house was open, a glass pane in the side garage door was broken, and the inner door from the garage to the kitchen was kicked in. The victim was lying dead on the floor of a disheveled bedroom. A small television and a broken jewelry box with blood on it lay near her head. A piece of plastic matching the television and a sliver of wood possibly matching the jewelry box were imbedded in her cheek. A bent butter knife and an unpackaged but unwrapped condom were underneath her body. Two envelopes containing approximately $400 lay underneath a dresser. A condom wrapper was on the living room couch. A trail of muddy shoe prints extended from the bedroom through the house to the side garage door, across the backyard, and onto an easement between the victim's house and her neighbor's house.

The examining pathologist observed numerous contusions, abrasions and lacerations to the victim's head, neck, arms, and hands, fractures of her skull, facial bones and index finger, and manual strangulation. Abrasions on the small of her back, left hip and extremities were consistent with fingernails dug into the skin. The pathologist also found vaginal injures likely caused by penetration with a foreign object rather than a bodily part such as a penis or finger. The injuries were consistent with penetration by a butter knife. The pathologist opined that the vaginal injuries occurred most likely before death, that death was from a blunt-force blow to the head, and that the head injuries were consistent with blows from the television.

---

[1] Petitioner timely filed his "Denial and Exception" in response to this court's extension of time within which to file his traverse.

[2] This statement of facts is taken from the October 4, 2001, unpublished opinion of the California Court of Appeal ("Opinion"), at 1-3, appended as Exhibit D to respondent's Answer.

Defendant was arrested 10 months later when his left middle fingerprint was found to match a partial fingerprint taken from the television, and his left palm print was found to match a print taken from the side garage door directly above its broken portion.

Six days after defendant's arrest the police interviewed his friend LaTroy Gates, who was then in custody on another matter. Gates told them that defendant came to his house the night of the homicide wearing a jacket containing blood spots and shod in tennis shoes that may have been Reeboks. Appellant removed a condom from his pocket, which Gates said was "just like" the one depicted in the police photograph of the condom wrapper found on the victim's couch.

Gates recounted for the police what defendant told him the night of the homicide: He was angry because "some little old white lady" spat on his mother or grandmother a few years earlier. He had been "plotting on" the victim, "a little old white lady," and "following her around" and watching her for a while. He entered her house alone through the backyard and a side door. He hit her several times with a television and a jewelry box. He killed her. There was money at her house that he could have taken but did not. He departed by a side gate. He knew he would get caught because he was not wearing gloves and had left fingerprints.

Gates told the police he did not initially believe defendant's story, but when he read a newspaper account of the homicide he realized defendant was telling the truth. Gates's mother was present during the interview and had admonished him to tell the police whatever he knew.

Gates had just turned 16 years of age at the time of the interview. He and defendant are approximately the same age.

At trial Gates denied that defendant told him "anything." He explained that he lied at his police interview notwithstanding his mother's admonition because he was frightened by the officers' remarks that he could be an accessory and be incarcerated for 10 or 20 years.

The media reports of the crime did not mention the jewelry box, condom, fingerprints or the envelopes of money.

Defense: Defendant did not testify. His defense was misidentification and third party culpability.

## ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

4

1    determined by the Supreme Court of the United States; or

2    (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
3    State court proceeding.

4    28 U.S.C. § 2254(d).

5         Under section 2254(d)(1), a state court decision is "contrary to" clearly established

6    United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law

7    set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially

8    indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different

9    result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406

10   (2000)).

11        Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas

12   court may grant the writ if the state court identifies the correct governing legal principle from the

13   Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

14   case. *Williams*, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

15   that court concludes in its independent judgment that the relevant state-court decision applied

16   clearly established federal law erroneously or incorrectly.  Rather, that application must also be

17   unreasonable." *Id.* at 412; *see also, Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not

18   enough that a federal habeas court, in its independent review of the legal question, is left with a

19   'firm conviction' that the state court was 'erroneous.'")

20        The court looks to the last reasoned state court decision as the basis for the state court

21   judgment. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court reaches a

22   decision on the merits but provides no reasoning to support its conclusion, a federal

23   habeas court independently reviews the record to determine whether habeas corpus relief is

24   available under section 2254(d).  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

25   ////

26   ////

5

II. Petitioner's Claims

    A. Admission of Pretrial Statements

    Petitioner contends the trial court erred in admitting evidence of his pretrial statements to Detectives Rick Leonardini and Carol Edmonds based upon a finding petitioner implicitly waived his *Miranda* rights[3] prior to asserting his right to counsel. Petitioner argues that since he asserted his right to counsel immediately upon being informed that he was a murder suspect, a prior waiver could not meet the requirements that the waiver be both knowledgeable and voluntary. The California Court of Appeal fairly summarized the background to this claim as follows:

> Appellant was the subject of a custodial police interrogation concerning the offenses on Friday, January 5, 1996, beginning at 8:00 p.m. When it concluded at 8:30 p.m., he was arrested for the victim's murder. Detectives Rick Leonardini and Carol Edmonds conducted the interrogation.
>
> At trial, the prosecutor asked Leonardini whether he had ever asked defendant if defendant "knew anything about the neighborhood where this crime was committed." Defendant objected on *Miranda* violation grounds. The court then held an Evidence Code section 402 hearing to determine the admissibility of defendant's statements to the police.
>
> During the hearing, Leonardini testified that on January 5, 1996, he and Edmonds transported defendant from juvenile hall to the police station to interview him about the instant offenses.

---

    [3]  In *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. . . . [T]he following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking, there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned."

According to the transcript of defendant's interview, he was in custody in juvenile hall on an unrelated matter.

En route he did not tell defendant why he was being taken to the police station.

The court then viewed the videotape of defendant's interview, conducted by Edmonds and Leonardini, which revealed the following information:

Edmonds initiated the interview by telling defendant he was brought to the station because the officers wanted to talk with him about an incident that happened on Nevada Street in Fairfield.  Defendant responded, "Where's Nevada Street[?]"  The officers identified Nevada Street by describing the neighboring streets and landmarks. As they did so, defendant appeared to know the area, although not the specific street names.

Edmonds then stated, "[T]his was an incident that happened last March, towards the end of last March in 1994 . . . [a]t 700 Nevada Street . . . ."  Leonardini reminded her the current year was 1996 and that the incident occurred in March 1995.  As the officers established the correct year, defendant said "yep" and "uh-huh."

Once the correct year was established, Edmonds advised defendant of his Miranda rights and asked if he understood them.

"DEFENDANT:  Yes.

"EDMONDS:  Keeping those rights, do you want to talk about this[?]

"DEFENDANT:  Talk about what?

"EDMONDS:  This incident that happened on Nevada Street in March."

Before defendant responded, Leonardini and Edmonds emphasized that the interview had nothing to do with the matter for which he was presently in custody, and there would be no discussion about that matter.  Leonardini then asked, "You understand where . . . what . . . where we're talking about[?]"  When defendant replied "No," Leonardini drew a detailed map of the Nevada Street area. Defendant replied, "Yeah, I know what you're talking about now."

Leonardini reiterated that the officers wanted to talk about an incident that occurred the previous March on Nevada Street.

"LEONARDINI:  We need for you to tell us what went on that night.

"DEFENDANT:  What are you talking about?

"LEONARDINI:  You have no idea?

"DEFENDANT:  In March?

////

7

"LEONARDINI:  Yeah, end of March.  Were you living in Fairfield at the end of March[?] . . . .

"DEFENDANT:  March.  What was I doing in March.  I can't even recall it.

"LEONARDINI:  You can't--you don't know where you [were] living in March[?]

"DEFENDANT:  Oh yeah, I was--yeah, I was at the house."


The officers continued questioning defendant about his living arrangements, his familiarity with the Nevada Street neighborhood, and his acquaintances in that neighborhood.  They explained their inquiry had to do with an old lady who was killed in a house on Nevada Street and whether he knew or had anything to do with the killing.  He replied that he remembered reading about the incident in the newspaper, that it was the first homicide of the year, and that it occurred at carnival time.  He denied knowing the victim or going by her house after reading about the incident.  When he commented that he understood the perpetrators were "already [caught]," Leonardini replied there was no one yet in custody.

Leonardini then left the interview room.  Edmonds asked defendant why he was shaking his head, and defendant replied, "I got two things they trying to pin on me in Sacramento, man, and all this is just, damn, I'll just try not to move my head."  He and Edmonds had further discussion about the Sacramento incident, during the course of which defendant remarked that his attorney was scheduled to talk to him on January 12.

Edmonds then asked, "So who's Jay Dog?," referring to a person defendant had identified as an acquaintance in the earlier questioning about the Nevada Street neighborhood.  Defendant explained that Jay Dog was "Jamal" who had recorded a rap song tape, but Jay Dog was different from defendant's rap music partner, named Lee.  Edmonds asked if "Jamal" was "Jamal Smith."

"DEFENDANT:  Jamal Smith?  No.

"EDMONDS:  No.  You know the Smith family?

"DEFENDANT:  I don't know Jamal Smith.

"EDMONDS:  Park Lane.

"DEFENDANT:  I only know two Jamals, one that rests in peace, you know what I'm saying.

"EDMONDS:  Uh-huh.

"DEFENDANT:  Uh.  Jamal, the other one came out with the tape.  Yeah, man, 'cause I think I'd rather have my attorney around before I--while I'm talking to you--you talking to me, whatever.  Know what I'm saying.  Keep my mouth shut. . . ."

8

A further short discussion about a previous arrest and the arresting officer ensued, and Leonardini then reentered the interview room. Defendant asked if he was being arrested for "this." Leonardini replied they were talking to him because his name had come up during their long investigation of the incident. Edmonds interrupted to tell Leonardini that while he was out of the room, defendant said he might want to have his attorney present. Defendant confirmed that he "would like to have [his] attorney." He gave a physical description of one recent attorney, but did not remember her exact name, noting that he had different attorneys in the five times he had been to court. The officers said they would attempt to reach an attorney for him that night, although contacting the described attorney, without her exact name, could be difficult on a Friday night. Leonardini instructed defendant to "sit tight." He also told him that he was brought in for the interview because his fingerprint matched a print found at the victim's house.

After the court and the parties viewed the videotape, defendant argued that, although he was advised of his *Miranda* rights, the videotape showed that he had not knowingly waived them. The court disagreed. It found that although there was no explicitly articulated waiver, the fact that defendant continued speaking to the detectives after receiving the advisement constituted a knowing and intelligent waiver of his *Miranda* rights. Therefore, it admitted his statements up until his telling Edmonds, "I think I'd rather have my attorney around before I--while I'm talking to you--you talking to me, whatever," and disallowed everything thereafter.

Opinion at 4-7.

Petitioner did not testify at trial but evidence of his pretrial statements was admitted pursuant to the testimony of Detective Leonardini, specifically: that petitioner was familiar with, but did not frequent, the area of town in which the homicide occurred; that petitioner didn't have any friends in the area or on the street where the homicide occurred and had never been to the victim's residence; that petitioner recalled reading about the homicide in the newspaper; that petitioner recalled that it was the first homicide of 1995 in Fairfield and occurred about the same time as the carnival; that petitioner referred to the victim as an old white lady and thought that a white guy had been arrested for the crime; and that petitioner recalled seeing a sketch of a suspect in the newspaper about a month and half after the homicide. Reporter's Transcript on Appeal ("RT") at 652-658.

Petitioner concedes he was timely advised of his *Miranda* rights and stated to the detectives that he understood those rights. Petitioner contends, however, that he at no point

9

waived his rights, even implicitly.  App. Brf.[4] at 25.  Rather, asserts petitioner, he continued to

talk with the detectives only to ascertain "what it was the police wished to discuss with him.

When he finally was clearly told the subject matter at hand; to wit, the fact that police were

interested in him as a suspect for the killing of Dorothy Stone, he stated that he wanted a lawyer

and asked that police help him to contact his lawyer."  *Id.*  Petitioner asserts he was prejudiced

by the introduction of his pretrial statements,[5] the prosecutor's reliance thereon in his closing

argument,[6] and the trial court's instructions to the jury of criminal California Jury Instruction

("CALJIC") 2.03 (consciousness of guilt may be inferred by defendant's willfully false or

////

////

---

[4]  As noted *supra* at pp. 2-3, petitioner submitted, in support of both his writ petition and traverse, a copy of his opening appellate brief before the California Court of Appeal.

[5]  Petitioner cites *Miranda,* 384 U.S. at 477, which provides:  "Statements merely intended to be exculpatory by the defendant are often used . . . to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication.  These statements are incriminating in any sense of the word."

[6]  Petitioner cites the following portion of the prosecutor's closing argument, RT at 1114-1115:

> Mario Stanford agreed to speak to the officers.  Said, hey, 700 Nevada Street, no way, I have nothing to do with that place.  But what did he remember?  What did he remember?  Another–another 16-year-old, 17-year-old kid just like LaTroy Gates [prosecution witness].  Now, think about this.  On the 5th of January, 1996–you got the murder occurring back on the 23rd, 22nd of March, 1995.  That's almost ten months.  That's like you being able to sit in a room and give details about a crime that occurred in early March of this year.  How much details can you give?  Do you remember what the first murder of the year was in Fairfield?  Mario Stanford's– little old white lady, wasn't it?  Sound familiar?  Little old white lady.  First murder of the year in Fairfield.  Carnival was in town, wasn't it?  Didn't you catch that white guy?  I saw his sketch in the paper, May 10th.

> Mario Stanford not only knew the details, he knew the details from stories a couple months later.  Why?  What 17-year-old kid is going to know those details unless they've got a reason to know them?  He's following the story.  He wants to know everything the police know.  His problem was, he told LaTroy.  That was his problem.

1   deliberately misleading statement).[7]

2       The United States Supreme Court has set forth the following requirements for finding a

3   waiver of *Miranda* rights:

> A statement is not compelled within the meaning of the Fifth Amendment if an
> individual voluntarily, knowingly and intelligently waives his constitutional
> privilege.  The inquiry whether a waiver is coerced has two distinct dimensions.
> First the relinquishment of the right must have been voluntary in the sense that it
> was the product of a free and deliberate choice rather than intimidation, coercion,
> or deception.  Second, the waiver must have been made with a full awareness
> both of the nature of the right being abandoned and the consequences of the
> decision to abandon it.  Only if the totality of the circumstances surrounding the
> interrogation reveal both an uncoerced choice and the requisite level of
> comprehension may a court properly conclude that the *Miranda* rights have been
> waived.

10  *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (citations and internal quotations omitted).

11      These requirements were clearly identified and relied upon by both the trial and appellate

12  courts.  The trial court found that petitioner's discussion with the detectives after being informed

13  of his *Miranda* rights constituted an implicit waiver of these rights until invoked by petitioner's

14  statement, "'Because I think I'd rather have my attorney.'"  RT at 652.[8]  The trial court reasoned:

> I'm satisfied . . . that with the rights that were read by Detective Edmonds, that
> the defendant understood the rights.  He indicated he did. . . . Once he [petitioner]
> knows he has a right to an attorney, and then knowing he had . . . a right to
> demand an attorney, and he didn't do it, so he waived – I'll make a finding that he
> knowingly and intelligently waived his rights to an attorney, and he also gave up
> his right against self-incrimination by speaking to the officers at that time. [¶ ] . . .
> I'll allow those statements that are made subsequent to where he says, "So what is
> this all about," on page 9, and never asking for an attorney up until that point, up
> until the time that he asked for an attorney.  [¶ ] Once he says, page 17, "Because
> I think I'd rather have my attorney," right there, anything after that will not be
> allowed by this Court.  That will be the order of the Court.

22      [7] CALJIC 2.03 provides:  "If you find that before this trial [a] [the] defendant made a
    willfully false or deliberately misleading statement concerning the crime[s] for which [he] [she]
23  is now being tried, you may consider that statement as a circumstance tending to prove a
    consciousness of guilt.  However, that conduct is not sufficient by itself to prove guilt, and its
24  weight and significance, if any, are for you to decide."  The trial court instructed the jury
    accordingly.  RT at 997.

25
        [8] Respondent references the transcript of petitioner's interview by detectives (set forth at
26  RT 557-580) as "AUG," pages 1 through 24.  This court references only the RT designation.

RT at 651-652.

In the last reasoned state court decision upholding this finding, the California Court of Appeal expressly relied on federal and consistent state law requiring that a waiver of *Miranda* rights be both voluntary and knowledgeable,[9] and rejected petitioner's arguments for the following reasons:

> On this record both elements of the waiver question are satisfied. There is nothing to suggest Detectives Leonardini or Edmonds resorted to physical or psychological pressure to elicit defendant's statements. They informed him of the purpose of the interview at its outset, their questions were uncomplicated and straightforward, and they were not accompanied by threats or deceit. Defendant was not induced to make his statements by improper promises. (*See Whitson*, supra, 17 Cal. 4th at p. 249.) Therefore, the voluntariness element is clear.

> The knowledge element, which looks to whether defendant was aware of the rights that he was abandoning and the consequences of so doing, is also clear. There is no evidence that defendant's judgment or comprehension was impaired during the interrogation because he was ill or under the influence of drugs or alcohol. Neither he nor the officers referred to such an impediment, and the fact that he was brought to the interview directly from juvenile hall custody, where there would presumably be no access to drugs or alcohol, militates against any such inference.

---

[9] The California Court of Appeal set forth the following correct statement of law, Opinion at 8-9:

> When there has been no express waiver of a suspect's *Miranda* rights, the question of waiver must be determined on the totality of the circumstances surrounding the interrogation. (*People v. Whitson* (1998) 17 Cal. 4th 229, 246-247, & citations therein.) A court may properly conclude that the suspect has waived his right only if the totality of the circumstances reveals both a voluntary relinquishment of the rights, e.g., an absence of intimidation, coercion or deception, and the requisite level of comprehension of the nature of the right being abandoned and the consequence of abandonment. (*Moran v. Burbine* (1986) 475 U.S. 412, 421-423.) The People bear the burden of proving waiver by a preponderance of the evidence. (*Whitson*, supra, 17 Cal. 4th at p. 248.)

> An appellate court considering a claim that a statement is inadmissible because it was obtained in violation of a defendant's *Miranda* rights must accept the trial court's resolution of undisputed facts and inferences and evaluation of credibility, if supported by substantial evidence. (*Whitson*, supra, 17 Cal. 4th at p. 248.) Although the appellate court then determines independently whether, given those facts, the challenged statements were obtained illegally, it gives great weight to the "considered conclusions" of the lower court that reviewed the same evidence. (*Ibid.*)

There is also nothing to indicate defendant was of low intelligence or suffered any mental impairment that prevented his understanding his rights or the consequence of waiving them. He referred to reading the newspaper, he remembered when the victim was killed (carnival) and that it was the first homicide of the year. He understood Leonardini's depiction of the geographic layout of the Nevada Street neighborhood, and his reference to a music partner suggests an awareness of business issues involved in creating a rap music tape.

Finally, defendant, although young, was not a stranger to the criminal justice system. He was in custody on another criminal matter at the time of the interview. He had been previously made a ward of the juvenile court for assault with a deadly weapon and possessing a firearm in a school zone. When he was advised of his *Miranda* rights here, he answered affirmatively that he understood his rights, and he did not immediately ask for his attorney, although he knew he had one, or announce that he did not choose to speak to the officers. Instead, when asked if, "keeping those rights," he wanted to talk about "this," he sought more details of the subject of the interview, e.g., "Talk about what?" His response reasonably implies curiosity about the subject and willingness to participate in the conversation, not a lack of agreement to speak. Once provided more geographic detail of the incident, he did not decline to speak but said, "I know what you're talking about now," and continued to engage in a dialogue with the officers until he requested his attorney.

This record supports the trial court's ruling. Defendant's remarks and actions demonstrate that, even though he did not explicitly articulate a waiver, he was fully aware of his *Miranda* rights and, given the opportunity to exercise them, knowingly and intelligently elected to waive them until, as manifested by his subsequent request for his attorney, he no longer chose to do so.

Opinion at 8-9.

Upon review of the entire record, *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998), particularly the transcript of the detectives' interview of petitioner, this court concludes that the Court of Appeal (and trial court before it) reasonably applied federal law to find petitioner made a voluntary and knowledgeable waiver of his *Miranda* rights until such time that he stated, "I think I'd rather have my attorney." RT at 573.

Petitioner contends that waiver of his *Miranda* rights cannot be implied prior to his explicit assertion of those rights because until that point he had not been informed he was a murder suspect and was therefore unaware of the consequences of waiving his rights. The transcript of petitioner's interrogation does not support this contention. Although the initial part of the interrogation included only general explanations by the detectives and petitioner's efforts

1   to ascertain the purpose of the interview, petitioner continued to engage in the discussion

2   subsequent to being informed that he was a suspect in the murder.  Most of the statements

3   petitioner challenges were made after this point.

4        Specifically, after being informed of the precise location of the victim's house and

5   neighborhood, petitioner asked, "So what this all about?"  RT at 565.  Detective Edmonds stated,

6   "Well, Mario, this is about a woman that got hurt at that house."  In response to petitioner's

7   question, "What you trying to say, I got something to do with it?"  Detective Edmonds

8   responded, "Well, yeah."  Detective Leonardini added, "That's what we're trying to find out,

9   you know.  I mean, that's why we're here talking to you, okay?  You know, we want to sit down,

10  find out what, if anything, you know about this."  Petitioner asked, "What–what happened?

11  How'd I hurt her?"  Detective Leonardini responded, "Well, there was an old lady–a lady that

12  was killed in the house," to which petitioner responded, "Oh goodness, man."  *Id.*

13       At this juncture, petitioner was clearly put on notice that he was a suspect for the killing

14  and, having been fully apprised of his rights, nonetheless proceeded to answer the detectives'

15  questions.  The record does not support petitioner's claim that he answered the detectives'

16  questions without understanding that he was a suspect for the killing and invoked his rights only

17  when this fact became clear.

18       The totality of these circumstances supports the finding petitioner voluntarily spoke with

19  the detectives based upon a full understanding of the purpose for his interview.  The record

20  supports the appellate court's finding that there is no evidence the detectives intimidated or

21  coerced petitioner, either physically or psychologically.  As noted by the Court of Appeal, the

22  detectives' questions were uncomplicated and straightforward, without threats or improper

23  promises.  The record also supports the appellate court's finding that petitioner's waiver was

24  knowledgeably made, with petitioner fully cognizant of both the rights he abandoned and the

25  consequences of his temporary abandonment.  The Court of Appeal properly considered both

26  petitioner's familiarity with the criminal justice system and the absence of evidence of impaired

14

intelligence, judgment or comprehension.  Petitioner's claim that the detectives were deceptive in failing fully to inform him of the reason for his interview – impacting both the deliberateness of plaintiff's choice to speak and his appreciation of the consequences for doing so – is not supported by the record.  Petitioner was well aware that the officers were asking him questions to because they believed he had information about or was involved in the murder.  He obviously did not know that witness Gates had told them of petitioner's previous admissions.  However, the officers were not required to tell petitioner factual details that the officers already knew from the investigation up to that point.

This court therefore concludes that the rejection of petitioner's *Miranda* claim in the state's last reasoned decision was neither contrary to, nor an unreasonable application of, clearly established Supreme Court authority, nor an objectively unreasonable application of law to the facts of this case.  The court does not, therefore, reach petitioner's further claim that the admission of his pretrial statements was prejudicial.[10]

Accordingly, petitioner is not entitled to relief on his *Miranda* claim.

B.  Sufficiency of Evidence to Prove Rape Special Circumstance

Petitioner contends the evidence was insufficient to prove the special circumstance allegation of rape because the prosecution's case was not premised on a felony-murder theory but on premeditated murder, that is, that pursuant to the prosecution's theory petitioner formed the intent to kill prior to entering the victim's house, any other felony committed in the course of

////

////

---

[10]  Even if this court were to have found an invalid waiver or no waiver at all, petitioner has failed to demonstrate actual prejudice by the admission of his pretrial statements at trial, that is, a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Renderos v. Ryan*, 469 F.3d 788, 798 (9th Cir. 2006)(quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-638 (1993) (improper reliance on post-*Miranda* silence)).  It is reasonable to infer that petitioner's pretrial statements were relatively insignificant to the jury's verdict in light of the identification of petitioner's fingerprint and palm print inside the victim's home and the inculpatory pretrial statements of prosecution witness LeTroy Gates.

15

1   the murder was *res ipsa* "merely incidental" to the murder.[11]  Petitioner notes correctly that the

2   prosecution did not make a felony-murder argument to the jury and the trial court did not instruct

3   the jury on a felony-murder theory.

4        "Under clearly established Supreme Court case law, due process requires that 'no person

5   shall be made to suffer the onus of a criminal conviction except upon sufficient proof – defined

6   as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of

7   every element of the offense.'  To determine whether this due process right has been violated,

8   the appropriate inquiry before the passage of AEDPA was a straightforward question of

9   'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

10  trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

11  *Sarausad v. Porter*, ___F.3d___, 2007 WL 675991, *4 (9th Cir. 2007)(quoting *Jackson v.*

12  *Virginia*, 443 U.S. 307, 316, 319 (1979)).  Pursuant to AEDPA, the Ninth Circuit relies on

13  § 2254(d)(1) to evaluate a state court's sufficiency-of-the-evidence determination under *Jackson*.

14  *Id*. (citing *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir.2005) (as amended), and the consistent

15  holdings of "our sister circuits" (*Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002); *Sanford*

16  *v. Yukins*, 288 F.3d 855, 863 (6th Cir. 2002); *Piaskowski v. Bett*, 256 F.3d 687, 691 (7th Cir.

17  2001); *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir. 2001)).[10]  "Under 28 U.S.C. § 2254(d)(1), we

18  inquire whether a state court determination that the evidence was sufficient to support a

19  conviction was an 'objectively unreasonable' application of *Jackson*."  *Sarausad,* 2007 WL

20  675991 at *4.  The test is whether the appellate court's conclusion is reasonable, viewed in the

21  light most favorable to the prosecution.

22

23      [11]  In a related argument, discussed *infra*, petitioner asserts error in the trial court's failure
24  to instruct the jury that the rape special circumstance could not be found true if the rape was
    merely incidental to the murder.

25      [10]  Because "§ 2254(d)(2) is not readily applicable to *Jackson* cases," the Ninth Circuit
26  evaluates "a state court's resolution of a *Jackson* sufficiency-of-the-evidence claim" under only
    § 2254(d)(1).  *Sarausad,* 2007 WL 675991 at *5.

16

1    "The *Jackson* standard 'must be applied with explicit reference to the substantive

2    elements of the criminal offense as defined by state law.'"   *Sarausad,* 2007 WL 675991 at *6

3    (quoting *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir.2004) (en banc) (internal quotation marks

4    omitted)).[11]   Under California law, a first degree murder is punishable by death or life

5    imprisonment without the possibility of parole if one or more special circumstances are found to

6    be true, Cal. Penal Code §§ 190.2, 190.4(a), including "rape by instrument." Cal. Penal Code

7    § 190.2(a)(17)(K).  The special circumstance of "rape by instrument" requires "an act of sexual

8    penetration" ("the act of causing the penetration, however slight, of the genital or anal opening

9    of any person . . . for the purpose of sexual arousal, gratification, or abuse by any foreign object,

10   substance, instrument, or device, or by any unknown object"), § 289(k)(1), "accomplished

11   against the victim's will by means of force, violence, duress, menace, or fear of immediate and

12   unlawful bodily injury on the victim or another person." Cal. Penal Code § 289(a)(1).  This

13   element was proven here.  Thus, it is immaterial that the prosecution did not proceed on a

14   "felony murder" theory.

15          Proof of a felony-murder special circumstance must demonstrate that the felony was

16   committed for a reason independent of the murder, that is, for an "independent felonious

17   purpose," and was not "merely incidental" to the murder.  *People v. Green*, 27 Cal.3d 1, 61

18   (1980), *superseded by statute on other grounds*.  "[T]o prove a felony-murder

19   special-circumstance allegation, the prosecution must show that the defendant had an

20   independent purpose for the commission of the felony, that is, the commission of the felony was

21   not merely incidental to an intended murder."  *People v. Mendoza*,  24 Cal.4th 130, 182 (2000).

22

23          [11]  This analysis permits the determination that "circumstantial evidence and inferences drawn from the record may be sufficient to sustain a conviction.  However, mere suspicion or speculation cannot be the basis for creation of logical inferences.  Where behavior is consistent

24   with both guilt and innocence, the burden is on the State to produce evidence that would allow a rational trier of fact to conclude beyond a reasonable doubt that the behavior was consistent with

25   guilt.  However, the prosecution need not affirmatively rule out every hypothesis except that of guilt.  A jury's credibility determinations are entitled to near-total deference under *Jackson*."

26   *Sarausad*, 2007 WL 675991 at *5 (citations and internal quotations omitted).

A felony-murder special circumstance can be sustained upon proof of concurrent intent, that is, that the defendant had "independent, albeit concurrent, goals" of committing both the murder and the felony.  *People v. Clark*, 50 Cal.3d 583, 608-609 (1990); *see generally, Clark v. Brown*, 442 F.3d 708, 715-720, *as amended*, 450 F.3d 898 (9th Cir. 2006).

As a threshold matter, as noted, it does not matter that the prosecution sought to prove a felony-murder special circumstance without proceeding on a first degree felony-murder theory to establish the charge of murder.  As the Ninth Circuit has explained, "[t]he difference between the two is significant.  The felony-murder rule broadens criminal liability, imposing a kind of vicarious liability for murders that occur during the commission of a felony.  A defendant may be convicted of murder under the felony-murder rule if he is involved in the commission of a felony during which a murder occurs, even if he does not do the killing. . . . The felony-murder special circumstance statute, by contrast, narrows criminal liability, allowing capital punishment [and life imprisonment] only for a certain restricted class of murders.  Under the felony-murder special circumstance statute, as defined in *Green*, a defendant . . . is death-eligible only if the murder advances an independent felonious purpose, such as the murder of a witness to a felony in order to avoid identification. . . . Felony murder, without more, does not make a defendant eligible for the death penalty.  California's felony-murder rule is significantly broader than its felony-murder special circumstance statute."  *Clark v. Brown*, 442 F.3d at 723-724.

Applying these legal principles, the California Court of Appeal rejected petitioner's argument the prosecution's theory of premeditated murder precluded a finding of independent intent to rape, and reasonably concluded the evidence supports a finding of concurrent, though independent, felonious intents to both rape and murder.  The appellate court reasoned:

> Relying primarily on the prosecutor's closing argument, defendant argues that there is only speculation that he had an independent intent to inflict a sexual assault when he entered the victim's house.  The prosecutor may have emphasized that defendant went to the victim's house with the intent to kill her, but his argument does not eliminate the fact that there was evidence to support a concurrent intent to commit a sexual offense.  *See People v. Kimble* (1988) 44 Cal. 3d 480, 502-503.

[Fn. 4] In fact, the prosecutor did argue in closing that defendant went to the victim's house with the intent both to commit a sexual assault and to murder the victim. He also emphasized the distinction between a felony incidental to a murder from a felony independent of a murder. "The law requires that the sexual assault . . . cannot be what's called incidental to the homicide. It has to be connected in some way. We . . . are asking you to find that the sexual assault of [the victim] was an intent on the part of [defendant] that was concurrent with his intent to kill her. . . . [¶] You cannot have a sexual assault in the course of a murder for a special circumstance, but if you have concurrent intent to commit both a sexual assault and a murder on the victim, as I suggest the evidence shows, then the . . . special circumstance of a murder in the commission of a genital penetration would be true, if you find that fact to be true, if you find that there is concurrent intent on the part of [defendant], or for that matter, if you find that that was his only intent or main intent when he first entered the residence. Remember, now, to put his intent before the murder."

Opinion at 11, including n. 4. Further, as accurately noted by the Court of Appeal, "[d]efense

counsel's closing argument did not address the special circumstance allegation at all." Opinion

at 11, n. 4.

This court has reviewed the transcripts and record of the proceedings leading to

petitioner's conviction and concludes that sufficient evidence was presented at trial for a rational

juror to have found the rape special circumstance allegation true based upon concurrent but

independent felonious intents to rape and murder. The California Court of Appeal accurately

summarized the evidence adduced at trial which supported the special circumstance finding:

The evidence was sufficient for the jury to conclude that the rape by instrument was not simply incidental to the murder. It could reasonably infer that, due to his anger toward "old white lad[ies]," defendant wanted to inflict a particularly degrading act on his victim. The condom wrapper on the living room couch and the unwrapped condom under the victim's body reasonably imply that defendant entered the victim's house with the intent to perpetrate a sexual offense, which would qualify as such an act. According to the pathologist, the victim's vaginal injuries occurred while she was alive, and they were consistent with injuries inflicted by a butter knife. A butter knife was found under the victim's body, but the victim's death was caused by a blunt-force blow to the head, not by the butter knife or penetration therewith. The locale of the victim's "fingernail" abrasions--1ower back and hip--imply infliction during a sexual assault, not while administering blows to the head with a television. Given this evidence, a rational fact finder could conclude that defendant had independent but concurrent goals of sexually assaulting and killing the victim. (*Raley*, supra, 2 Cal. 4th [870 (1992)] at p. 903.)

Opinion at 10.

19

1   This court finds the appellate court's determination and reasoning both reasonable and

2   consistent with the record.  Of particular significance is the evidence of vaginal injuries and

3   fingernail abrasions demonstrating the rape occurred prior to the victim's death, that petitioner

4   had a motive to degrade the victim (requiring she be alive during the rape), the presence of

5   condoms suggesting some forethought, and the instrument of rape was unrelated to the cause of

6   death.  The Court of Appeal's findings conform to the *Jackson* requirement that a rational trier of

7   fact could find, beyond a reasonable doubt, the essential elements of concurrent felonious intents

8   to rape and murder.

9       Accordingly, petitioner is not entitled to relief on his claim that the evidence is

10  insufficient to support the rape special circumstance finding.

11      C.  Jury Instruction

12      Petitioner contends he was denied due process by the trial court's failure to instruct the

13  jury sua sponte that the rape special circumstance could not be found true if the rape was

14  "merely incidental" to the murder.  Petitioner argues the omission of this instruction "lightened"

15  the prosecution's burden of proving each element of the special circumstance beyond a

16  reasonable doubt, resulting in a denial of due process that requires reversal per se.

17      In general, a challenge to jury instructions does not state a federal constitutional claim.

18  *See Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107,

19  119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant

20  federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or

21  even "universally condemned,"' but must violate some due process right guaranteed by the

22  fourteenth amendment."  *Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Cupp*

23  *v. Naughten*, 414 U.S. 141, 146 (1973)).  To prevail on such a claim petitioner must demonstrate

24  that the "ailing instruction . . . so infected the entire trial that the resulting conviction violates

25  due process.'" *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (quoting *Estelle v. McGuire*, 502

26  U.S. 62, 72 (1991)).  In making its determination, this court must evaluate the challenged jury

20

1   instructions "'in the context of the overall charge to the jury as a component of the entire trial

2   process.'" *Prantil*, 843 F.2d at 317 (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir.

3   1984)).  *See also, Middleton*, 541 U.S. at 437.  Where, as here, the challenge is to a refusal or

4   failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n

5   omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the

6   law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also, Villafuerte v. Stewart*, 111 F.3d

7   616, 624 (9th Cir. 1997).  A reviewing court must determine whether a challenged instruction or

8   failure to give an instruction prevented the jury from considering constitutionally relevant

9   evidence.  *Johnson v. Texas*, 509 U.S. 350, 367-368 (1993).   If error is found, the appropriate

10  inquiry is whether it had substantial and injurious effect or influence in determining the jury's

11  verdict.  *Brecht*, 507 U.S. at 637-638.

12          The California Court of Appeal fairly summarized the background to this claim as

13  follows:

14          The jury was instructed on willful, deliberate, and premeditated first degree
            murder.  The People did not pursue a first degree felony-murder theory, nor was
15          the jury instructed on felony-murder as a basis for finding defendant guilty of first
            degree murder.
16
            The jury was further instructed that if it found defendant guilty of first degree
17          murder, it then had to determine whether the special circumstance allegation was
            true.  Pursuant to part (l)(a) of CALJIC No. 8.81.17 the jury was instructed [based
18          upon the statutory language of Cal. Penal Code §§ 190.2(a)17(k), 289] :  "To find
            that the special circumstance, referred to in these instructions as murder in the
19          commission of genital penetration with a foreign or unknown object, is true, it
            must be proved:  1. The murder was committed while the defendant was engaged
20          in the commission of genital penetration with a foreign or unknown object."

21          The jury was not instructed with part (2) of CALJIC No. 8.81.17, which, as a
            conjunctive to part (1), states that it must be proved the murder was committed to
22          carry out or advance the commission of the felony, to facilitate escape therefrom,
            or to avoid detection, and that the special circumstance is not established if the
23          felony was merely incidental to the commission of the murder.

24  Opinion at 12.[12]

25  _____

26          [12]  As set forth by the Court of Appeal, Opinion at 12, n. 5, CALJIC No. 8.81.17
    provides:

1    As noted by the Court of Appeal, the defense neither requested that the trial court instruct

2    on Part 2 of CALJIC No. 8.81.17, nor objected to the instruction as given; rather, the record

3    supports the inference that defense counsel agreed to the instruction as given.[13]  Opinion at 12, n.

4    5, and 14.

5    ////

6    ////

7

---

8    To find that the special circumstance, referred to in these
     instructions as murder in the commission of _____, is true,
9    it must be proved:

10   [la.  The murder was committed while [the] [a] defendant was
     [engaged in] [or][was an accomplice] in the [commission] [or]
11   [attempted commission] of a _____;] [or] [and]

12   [lb.  The murder was committed during the immediate flight after
     the [commission] [attempted commission] of a _____ [by
13   the defendant] [to which [the] [a] defendant was an accomplice];
     and]
14

15   [2.  The murder was committed in order to carry out or advance the
     commission of the crime of _____ or to facilitate the escape
16   therefrom or to avoid detection.  In other words, the special
     circumstance referred to in these instructions is not established if
17   the [attempted] _____ was merely incidental to the
     commission of the murder.]

18   The Court of Appeal correctly noted that defendant does not assert the court erred in failing to
19   instruct on part (l)(b).  Opinion at 12, n. 5.

20       [13] As set forth by the Court of Appeal, the parties apparently agreed to provide the
     instruction as modified:

21   It appears from the record that CALJIC No. 8.81.17 was intentionally modified to
22   delete parts (l)(b) and (2).  After the parties rested and outside the presence of the
     jury, the court remarked that counsel and the court met earlier that day to discuss
     the instructions.  It then listed the instructions to be given, including CALJIC No.
23   8.81.17.  Defense counsel interrupted to ask if "8.81.7 wasn't modified." ([Sic.]:
     CALJIC No.8.81.17; CALJIC No. 8.81.7 governs murder of a peace officer.)  The
24   court agreed that it would be modified as discussed.  The discussion to which the
     court refers was not reported, so it is unclear why the court and/or parties thought
25   the modification appropriate.

26   Opinion at 12, n. 5; CT at 979.

1   The second portion of CALJIC No. 8.81.17 reflects the holding of the California

2   Supreme Court in *People v. Green*, *supra*, 27 Cal.3d 1, that proof of a felony-murder special

3   circumstance must demonstrate the felony was committed for an "independent felonious

4   purpose" and was not "merely incidental" to the murder.  *Id*. at 61 (felony is "incidental" if

5   intended to "facilitate" the murder).  "'Concurrent intent to kill and to commit an independent

6   felony will support a felony-murder special circumstance. (*People v. Clark*, supra, 50 Cal. 3d at

7   pp. 608-609.)  It is when the underlying felony is merely incidental to a murder that we apply the

8   rule of *Green*, supra, 27 Cal. 3d 1.'"  *Mendoza*, 24 Cal. 4th at 183 (quoting *People v. Raley*, 2

9   Cal. 4th 870, 903 (1992)).

10   Part 2 of CALJIC No. 8.81.17, the "*Green* instruction," does not constitute an "element"

11   of a felony-murder special circumstance, which would require instruction in all cases regardless

12   whether supported by the evidence.  *See People v. Valdez*, 32 Cal.4th 73, 113-114 (2004), and

13   cases cited therein.  Rather, Part 2 "clarifies" the special circumstance requirement that the

14   murder occur "during the commission" of a felony.  *People v. Kimble*, 44 Cal.3d 480, 501

15   (1988).  Absent evidence that the felony was "merely incidental" to the murder, "'the language

16   of a statute defining a crime or defense is generally an appropriate and desirable basis for an

17   instruction, and is ordinarily sufficient when the defendant fails to request amplification.'"

18   *People v. Estrada*, 11 Cal.4th 568, 574 (1995) (quoting *People v. Poggi*, 45 Cal.3d 306, 327

19   (1988)); *see also, People v. Hughes*, 27 Cal.4th 287, 379 (2002) ("merely incidental" is

20   unambiguous unless it becomes apparent the jury is confused and in need of further definition);

21   *accord, Raley*, 2 Cal.4th at 903.  Thus, Part 2 of CALJIC No. 8.81.17 need be instructed sua

22   sponte "only if some significant evidence would have allowed the jury to conclude" that the

23   felony was "merely incidental" to the murder.  *People v. Davis*, 36 Cal.4th 510, 568-569 (2005).

24   "A trial court must instruct on its own initiative only on those principles of law 'commonly or

25   closely and openly' connected with the facts of the case," viz., on "the independent felonious

26   purpose of *Green*" only if "some significant evidence could have supported a finding" the felony

was "merely incidental" to the murder.  *Id.* at 570 (quoting *People v. Montoya*, 7 Cal.4th 1027, 1047 (1998) (emphasis deleted)).   Thus, in the instant case, the trial court had a sua sponte duty to instruct the jury on Part 2 of CALJIC No. 8.81.17 *only if* "some significant evidence would have allowed the jury to conclude" that the rape by instrument was "merely incidental" to the victim's murder.  *Id.*

The California Court of Appeal duly recognized these legal principles[14] and properly

---

[14]   The California Court of Appeal relied on the following legal principles:

Trial courts have a duty to instruct juries on the general principles of law relevant to the issues raised by the evidence and on particular defenses when a defendant appears to be relying on such defense and there is substantial evidence to support them. (*People v. Estrada* (1995) 11 Cal. 4th 568, 574; *People v. Ainsworth*, supra, 45 Cal. 3d [984 (1988)] at p. 1026.)  General principles of law governing the case are those connected with the evidence and necessary for the jury's understanding of the case. (11 Cal. 4th at p. 574.)  "As to pertinent matters falling outside the definition of a 'general principle of law governing the case,' it is 'defendant's obligation to request any clarifying or amplifying instruction.' [Citation.]" (*Ibid.*)

The language of a statute defining a crime is generally an appropriate basis for an instruction, and is ordinarily sufficient when the defendant does not request amplification.  If the jury would have no difficulty in understanding the statute without guidance, the court need only instruct with the statutory language. (*Estrada*, 11 Cal. 4th at p. 574.)  Part 1 of CALJIC No. 8.81.17 mirrors the statutory language of section 190.2, subdivision (A)(17)(K), which imposes the penalty of death or life without parole on a defendant guilty of first degree murder if the jury finds true that "[t]he murder was committed while the defendant was engaged in . . . the commission of . . . Rape by instrument in violation of Section 289."

In *People v. Kimble*, supra, 44 Cal. 3d 480, the trial court similarly instructed that to find the felony-murder special circumstance true, the jury had to find that the murder was committed during the commission of the underlying felonies, in that case a robbery and a rape.  (Id. at pp. 499-500, fn. 15.)  The defendant argued on appeal that the court was also obligated to instruct sua sponte with language comparable to that in part (2) of CALJIC No. 8.81.17.  Although *Kimble* endorsed the use of such language when instructing on felony-murder special circumstance (44 Cal. 3d at p. 501, fn. 16), it rejected the idea that such language constituted an element of the special circumstance on which the jury had to be instructed in all cases.  It characterized the language as simply "clarifying" the scope of the special circumstance.  Consequently, *Kimble* concluded, the court is required to instruct sua sponte with such clarifying language only if there is evidentiary support for a theory that the underlying felony was merely incidental to the murder, and the defendant did not harbor an independent felonious purpose as to that felony.  (*Id.* at pp. 501-503; *see also People v. Ainsworth*, supra, 45 Cal. 3d at

1   concluded the trial court did not have a sua sponte duty to instruct on part 2 of CALJIC 8.81.17

2   because the defense had offered no evidence or argument that the rape was incidental to the

3   murder:

> This record does not demonstrate a sua sponte obligation to instruct with CALJIC No. 8.81.17, part (2).  As discussed, ante, there was strong evidence from which the jury could find that defendant's intent in committing the sexual assault was independent of his intent to kill:  his anger, the presence of the condom, the assault occurring before the victim's death, and the absence of a causal relationship between the assault and the manner in which her death was inflicted. Defendant's defense to the charges was misidentification and third party culpability.  He did not defend explicitly or impliedly against the special circumstance based on the sexual assault being merely incidental to the murder. Additionally, the prosecutor proceeded under a theory that the sexual assault was not incidental to the murder but the product of a concurrent but independent intent.  (*See* fn. 4, ante.)  Because (1) the court's instructions correctly and adequately explained the general principle of law requiring a determination whether the murder was committed "during the commission" of a felony, (2) the prosecutor's closing argument reinforced and expanded on that correct principle, and (3) the evidence did not raise an issue with respect to the application of the special circumstance law to the defense, the obligation lay with defendant to request any clarifying or amplifying instruction on the subject.  (*Kimble*, supra, 44 Cal. 3d at p. 503.)

14   Opinion at 14.

15       The appellate court's analysis is supported by this court's review of the evidence,

16   particularly the evidence of independent felonious intent to rape and murder, as discussed *supra*.

17   The defense neither argued nor presented evidence in support of the theory that the victim's rape

18   was merely incidental to her murder, nor did the defense request or object to the omitted

19   instruction.  *Cf.*, *Clark v. Brown*, 442 F.3d at 711, 718 (trial court's failure to provide *requested*

20   "*Green* instruction" *embodying the defense theory of the case* violated defendant's due process

21   right to present a complete defense); *see also, Valdez*, 32 Cal.4th at 307-308 ("Defendant's

22   failure to either object to the proposed instruction or request that the omitted language be given

23   to the jury forfeits his claim on appeal." (Citations and internal quotations omitted)).  Rather, the

25       p. 1026.)

26   Opinion at 13-14.

defense relied upon theories of misidentification and third party culpability to the exclusion of countering inferences associated with the facts of the crime.

Petitioner has failed to sustain his "heavy burden" of demonstrating a miscarriage of justice based upon the trial court's failure to give the omitted instruction. As there is no reasonable likelihood the jury was foreclosed from considering relevant evidence, this court finds no error. The Court of Appeal's decision on this matter was neither contrary to, nor an unreasonable application of, clearly established federal law, nor did it constitute an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1), (2).

Accordingly, petitioner is not entitled to relief on his claim that the trial court erred in failing to instruct the jury sua sponte on Part 2 of CALJIC 8.81.17.

III. Conclusion

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:   April 26, 2007.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE